**ESTATE OF Aleta V. BAILEY, by Richard OARE, Administrator and Cameron C.R. Bailey, Appellants,**

v.

**COUNTY OF YORK, York County Children and Youth Services and Ora G. Gruver, York County Children and Youth Services Administrator, Individually and in her official capacity.**

No. 84–5231.

United States Court of Appeals, Third Circuit.

Argued Nov. 26, 1984.

Decided June 27, 1985.

Rehearing Denied July 19, 1985.

Richard Oare (Argued), York, Pa., pro se.

Wentworth Darcy Vedder, Bishop Nichlas Kauffman Morris, Vedder & Ream, York, Pa., for appellants.

Robert G. Schwartz (Argued), Philadelphia, Pa., amicus curiae.

Roger T. Shoop (Argued), Thomas & Thomas, Harrisburg, Pa., for appellee County of York and York County Children and Youth Services.

John B. Mancke (Argued), Mancke, Lightman & Wagner, Harrisburg, Pa., for appellee Gruver, York County Children and Youth Services Administrator, individually and in her official capacity.

Before ADAMS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This action was brought pursuant to 42 U.S.C. § 1983 by Richard Oare, the administrator of Aleta V. Bailey's estate, and by Cameron C.R. Bailey, father of Aleta V. Bailey, against York County, York County Children and Youth Services (YCCYS), and Ora G. Gruver, the agency's administrator. In the complaint plaintiffs allege that Aleta Bailey's death from child abuse was the result of the actions of defendants who thereby deprived Aleta Bailey and her father of their constitutional rights.

The facts, as set forth in the complaint, are that five-year-old Aleta lived with her mother, Jo Ellen Bailey Naylor, and Larry Hake, Naylor's "paramour and cohabitant". On January 3, 1982 Carol Anne Stough and Theresa Tobling, relatives of Aleta, found severe bruises and other evidence of abuse on the child's body. On January 11, Tobling discovered additional bruises and telephoned the Child Hotline. On the same day another relative notified the police of the same information.

The next day, Beverly Mackerath, a YCCYS employee, took Aleta to York Hospital where the examining physician advised Mackerath that Hake's actions in striking Aleta were excessive, that he should not have access to the child, and that she should be taken from her mother if necessary to deny Hake access to her. That same day, Aleta was released from the hospital and placed with Carol Adams, her mother's aunt. Mackerath told Naylor that she had twenty-four hours to make arrangements for Hake to move from her home and that after arrangements were made to deny Hake access to Aleta, she would be returned to Naylor's custody and control.

The next night, YCCYS returned Aleta to her mother's custody. The complaint alleges that YCCYS undertook no independent investigation to determine the whereabouts of Aleta, Naylor, and Hake, and that they lived together both on a farm and in Naylor's home within the county. A month later Aleta died from physical injuries inflicted on her by Hake and her mother.[1]

In the complaint, plaintiffs allege that YCCYS disregarded the advice of the examining physician and treated Aleta, her mother, and Hake as a family unit, and failed to invoke the procedures of the state's Child Protective Services Law, 11 Pa.Stat.Ann. §§ 2208, 2223 (Purdon Supp. 1984). These sections provide a mechanism for judicial determination of the necessity for protective custody of abused children and appointment of a guardian ad litem for the child.

The complaint further alleges that YCCYS established, accepted and used "defective institutional policies and/or procedures"; that the County of York failed to properly evaluate the performance, policies and procedures of the agency and its director; and that Ora G. Gruver, the director, abused her position and power by establishing, accepting and employing the policies and procedures. As a result, the defendants are alleged to have deprived Aleta of her constitutional rights to counsel[2] and to life and to have deprived her

---

1. The district court noted that Hake was convicted of first degree murder and Aleta's mother was convicted of third degree murder. *Estate of Bailey v. County of York*, 580 F.Supp. 794, 794 (M.D.Pa.1984).

2. The district court held that the right to counsel claim was inappropriate in the context of civil proceedings and plaintiffs do not challenge that holding on appeal.

father of his constitutional right to parenthood.

Defendants filed answers to the complaint denying most of the factual allegations and setting forth numerous affirmative defenses. During discovery, defendants filed motions to dismiss arguing, *inter alia*, that plaintiffs failed to state a claim upon which relief could be granted, and that they were entitled to immunity on a variety of grounds.

The district court granted the motions, holding that "there was no constitutional deprivation by the state such as would support a cause of action in this court." *Estate of Bailey v. County of York*, 580 F.Supp. 794, 797 (M.D.Pa.1984). The district court reasoned that there are only two circumstances in which the state and its agencies are chargeable with allegedly unconstitutional conduct resulting from omissions: if injuries occur "while the injured party is in the legal custody of the state" or if the person "whose affirmative conduct causes the harm is under the direct control or supervision of the state." *Id.* Since Aleta was not in the legal custody of the state when she was murdered, nor were her mother and Hake under state control or supervision, the court concluded that the complaint stated no cause of action.[3]

## II.

■ To sustain a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), "we must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff," and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief. *Helstoski v. Goldstein*, 552 F.2d 564, 565 (3d Cir.1977) (per curiam).

As the Supreme Court stated, a federal court reviewing the sufficiency of a complaint has a limited task. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

■ The complaint in this case alleges that the promulgation and implementation by YCCYS of "policies and procedures" led to Aleta Bailey's death. As explained in *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), although a municipality may not be sued under § 1983 on a respondeat superior theory for an injury inflicted solely by its employees or agents, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." In an appropriate case, even in the absence of formal agency conduct, an "official policy" may be inferred "from informal acts or omissions of supervisory municipal officials." *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). "The issue of authorization, approval or encouragement is generally one of fact, not law." *Id.* at 201. *See also Owen v. City of Independence*, 445 U.S. 622, 633–34 & n. 13, 655 n. 39, 100 S.Ct. 1398, 1406–07 & n. 13, 1417 n. 39, 63 L.Ed.2d 673 (1980).

■ It does not follow from these principles that the mere description of an act as a "policy" or "procedure" meets the threshold for a § 1983 claim. Nor does every agency policy open it to § 1983 liability. In *Davidson v. O'Lone*, we noted that

---

**3.** Following the appeal, we appointed Robert G. Schwartz, Esq. of the Juvenile Law Center of Philadelphia as amicus curiae, and, after argument, held the case in a pending status until filing of this court's in banc decision in *Davidson v. O'Lone*, 752 F.2d 817 (3d Cir.1984), concerning the scope of 42 U.S.C. § 1983. We then requested the parties to file supplementary memoranda in light thereof, and also called this appeal to the attention of the Attorney General of Pennsylvania, to give him the opportunity to file a brief amicus curiae or submit a memorandum. The Attorney General responded that it would be inappropriate for him to do so because the Pennsylvania Department of Public Welfare has some regulatory and supervisory control over YCCYS.

"§ 1983 plays an effective role ... in providing a federal forum to challenge an established state procedure that infringes upon an individual's liberty or property interests." 752 F.2d 817, 828 (3d Cir.1984) (in banc), *cert. granted sub nom. Davidson v. Cannon,* —— U.S. ——, 105 S.Ct. 2673, 85 L.Ed.2d 692 (1985). Only if there is a plausible nexus between the policy or established state procedure and the infringement of constitutional rights can a § 1983 action be maintained. *See City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985) (Rehnquist, J.); *id.* at 2439 (Brennan, J.). An apt illustration appears in *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). There, the chief of police and the city were held liable because the chief's promulgation and implementation of a regulation delaying any disciplinary investigation of an officer's conduct until the underlying arrest was resolved was found to have caused the police officer to file unwarranted charges against the plaintiffs in order to delay any disciplinary investigation into an instance of use of excessive force.

Plaintiffs here have listed 15 "policies" of YCCYS in their complaint, many of which have little facial connection to the alleged deprivations. At least some of the others are, if proven, a potential basis for a claim of deprivation of a constitutional interest.[4] The complaint alleges that Aleta died "as a result of said defective institutional policies and procedures established, accepted and employed by York County Children and Youth Services in investigating the factors harming the child, in determining who was responsible for the child's welfare, and/or in taking appropriate steps to remedy and correct the child's environment so as to secure the child's welfare." Moreover, it does not appear, at least from the complaint, that plaintiffs are seeking to infer such policies through evidence of a single incident of unconstitutional conduct, a claim that would be precluded by the Supreme Court's decision in *City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

The complaint also alleges that plaintiffs' harm was caused by the actions of Gruver, the administrator of the YCCYS, taken in her official capacity in establishing, accepting and employing the enumerated allegedly defective policies and procedures. It is thus distinguishable from the unauthorized actions of a city employee for which the city cannot be held liable on respondeat superior under the holding in *Monell.*

Additional insight into the type of policies or practices for which a city may be held liable has been provided by the Supreme Court's recent decision in *Brandon v. Holt,* —— U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). There, the Court imposed liability on the city under § 1983 for damages caused by a vicious assault by a police officer, notwithstanding that the director of police had no actual knowledge of the officer's disciplinary record. The Court relied on the district court's finding that the director *"should have known* that [the officer's] dangerous propensities created a threat to the rights and safety of citizens." *Id.* at 875 (emphasis in original). The director's lack of actual knowledge "was found to have been caused by the 'policies in effect [which included] the inherently deficient nature of police administrative procedures involving the discovery of officer misconduct.'" *Id.* Such policies included a code of silence among officers and some supervisors and failure to take disciplinary action against offending officers in response to citizen complaints, which discouraged follow-up measures by complainants and led to covering up officer misconduct and insulation of the supervisors from knowledge of wrongdoing. *Id.* at 875–76 n. 6.

---

**4.** The complaint includes allegations that such defective institutional policies and/or procedures include, "not seeking judicial intervention in cases of serious child abuse where there was only one incident of said abuse"; "giving advance notice of home visits"; "failing to check observations of independent witnesses"; and "not notifying a natural parent of the nature and extent of the child abuse and the child's whereabouts".

As the Supreme Court has made clear in *Brandon v. Holt*, the actions of the official acting in his or her official capacity are to be equated with the actions of the city itself. 105 S.Ct. at 880. Justice Stevens wrote for the Court, "In at least three recent cases arising under § 1983, we have plainly implied that a judgment against a public servant 'in his official capacity' imposed liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. We now make that point explicit." *Id.* at 878 (footnote omitted).[5] *See also Owen v. City of Independence*, 445 U.S. at 638 n. 18, 100 S.Ct. at 1409 n. 18.

The allegations of the complaint may fairly be read to allege conduct rising to the level of deliberate indifference, reckless disregard, or gross negligence by the agency and by its supervisory officials fairly attributable to policies and practices of the agency.[6] They allege more than the mere "negligent monitoring of the mother's household," as stated by the dissent. They therefore adequately meet the standard of conduct encompassed by § 1983. *See, e.g., Voutour v. Vitale*, 761 F.2d 812, 820–22, 823 (1st Cir.1985); *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir.1981). *See also Davidson v. O'Lone*, 752 F.2d at 828. In *Doe v. New York City Department of Social Services*, 649 F.2d 134, 145 (2d Cir.1981) (*Doe I*), the court held that "[d]efendants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ame-

liorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution."

■■■ We reiterate that at this stage of the proceedings we are obliged to accept the complaint's allegations as true. Defendants have filed answers denying the principal allegations of the complaint and presenting a markedly different version of the facts than that of the plaintiffs. In fact, in YCCYS's brief on appeal, it is stated that YCCYS made periodic visits, both announced and unannounced, to Aleta and her mother following the return of Aleta to her mother's custody and that it had ascertained that Hake was no longer residing in that unit. Because we must remand this case, we stress that an error in judgment, an unforeseeable tragic event, a good faith but misinformed professional decision, or mere negligence will not suffice to impose liability under § 1983. Furthermore, to the extent that plaintiffs rely on the professional practices of the YCCYS to prove gross negligence, they will, of course, have to sustain the burden of showing that these practices are so far below the minimum accepted and generally prevailing professional standards as to permit the fact finder to infer deliberate or reckless indifference or unconcern or callous disregard for Aleta's safety. *See generally Doe v. New York City Department of Social Services*, 709 F.2d 782, 789–91 (2d Cir.) (*Doe II*), *cert. denied*, —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

### III.

The basis for the district court's dismissal of the complaint was that because Ale-

5. Gruver, who was sued individually and in her official capacity, argues that we should affirm the dismissal as to her on the ground that she is entitled to qualified immunity. She asserts that no facts are alleged that would indicate that she is liable in her individual capacity. That issue was not addressed by the district court and we believe it should have the opportunity to do so in the first instance. Of course, the decision of the Supreme Court in *Brandon v. Holt*, 105 S.Ct. at 878–79, precludes dismissal of the complaint on the ground of immunity insofar as it names Gruver in her official capacity because this is "only another way of pleading an action against

an entity of which an officer is an agent." *Id.* at 878 n. 21 (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035).

6. In a letter requested by the court, the amicus curiae stated: "Taken as a whole, the complaint in this case alleges deprivations caused by gross negligence or deliberate indifference, all of which were the product of defective state policies or practices." Letter from Robert G. Schwartz, Esq., Juvenile Law Center (Jan. 23, 1985).

ta's death was directly attributable to her mother and Hake, who were not under the control or supervision of the state, the conduct challenged at most was that of mere omissions by the agency, which would be actionable only if Aleta had been in the "legal custody" of the state when the incident occurred. 580 F.Supp. at 797.

In effect, the district court accepted YCCYS's claim that it did not owe a duty to Aleta.[7] It recognized that in *Doe I*, the Second Circuit held that an agency that placed a child in foster care could be liable for the child's sexual abuse by her foster parent because the agency failed to adequately supervise the placement. 649 F.2d at 145–47. The agency could be held liable under § 1983 because the jury could infer deliberate indifference from the agency's failure to comply with specific and unequivocal statutory duties or deliberate unconcern from a pervasive pattern of indifference. While the district court did not question the soundness of that holding, nor do we, the district court distinguished *Doe* because Aleta was not actually in the agency's legal custody.

The district court relied instead on the opinion in *Jensen v. Conrad*, 570 F.Supp. 91 (D.S.C.1983), where the district court had dismissed a § 1983 suit against the state and county social service agencies brought on behalf of a minor who died from abuse inflicted by her mother. The district court in *Jensen* held that the state and county officials had no legal duty to protect a child not in their legal custody. *Id.* at 109–11. Following adoption of that reasoning by the district court here, the case was appealed to the Fourth Circuit. Although the court affirmed the dismissal of the complaint, it did so on the basis of qualified immunity. *Jensen v. Conrad*, 747 F.2d 185, 194–96 (4th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). *But see Brandon v. Holt*, 105 S.Ct. at 878–79 (holding that a municipality is not entitled to qualified immunity under § 1983 for actions by its agents taken in their official capacity).

In *Jensen* the Fourth Circuit rejected the argument that a right of protection can never exist in the absence of a custodial relationship, and instead reaffirmed "that a right to affirmative protection need not be limited by a determination that there was a 'custodial relationship.' " 747 F.2d at 194 (citing *Fox v. Custis*, 712 F.2d 84 (4th Cir. 1983)). Because the court found immunity dispositive, it stated it was unnecessary to define the type of relationship required to give rise to a right of protection. It clearly suggested, however, that such a "special relationship" would exist under facts similar to those here. The factors it considered relevant were whether the victim or the perpetrator was in legal custody at the time of or prior to the incident; whether the state had expressly stated its desire to provide affirmative protection to a particular class or specific individuals; and whether the state knew of the victim's plight. *Id.* at 194–95 n. 11. The court stated, "Were the issue properly before this court on different facts, *there would be nothing to preclude* further definition of the meaning of that term followed by a *ruling that the facts of that case fell within the meaning of 'special relationship' "*. *Id.* at 195

---

7. Significantly, the court did not hold that Aleta or her father did not have a cognizable constitutional right. There is a liberty interest in being free from physical assault that can be fairly attributed to the action of a state. *See Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 318–19, 102 S.Ct. 2452, 2457–58, 2459–60, 73 L.Ed.2d 28 (1982); *Davidson v. O'Lone*, 752 F.2d at 828.

Aleta Bailey's father also has a cognizable liberty interest in preserving the life and physical safety of his child from deprivations caused by state action, a right that logically extends from his recognized liberty interest in the custody of his children and the maintenance and integrity of the family, *see Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Duchesne v. Sugarman*, 566 F.2d 817, 824–25 (2d Cir.1977). We follow the Seventh Circuit's decision in *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984), in holding based on these precedents that a parent whose child has died as a result of unlawful state action may maintain an action under § 1983 for the deprivation of liberty. *Id.* at 1242–45, 1251–53.

(emphasis added). Since neither of the children in the *Jensen* case was in the custody of the state or county agencies sued, the Fourth Circuit opinion undercuts the principal precedent on which the district court relied here.

The genesis of the notion that a duty may be based on the finding of a "special relationship" is the opinion in *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In that case the Court affirmed the dismissal on proximate cause grounds of a suit seeking damages for the torture and death of appellants' deceased caused by a parolee who had been paroled five months earlier by the defendant state officials. The Court stated, however, that

> the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger. We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole.

*Id.* at 285, 100 S.Ct. at 559 (footnote omitted).

Later cases have relied on this language to reject limiting § 1983 to cases in which there was a custodial relationship. In *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982), the court, while holding that the state has no duty "to protect the public from dangerous madmen," *id.* at 619, nonetheless stated, "If the state puts a man in a position of danger *from private persons* and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618 (emphasis added). Thereafter, the Fourth Circuit ruled that a right to protection could "arise out of special custodial *or other relationships.*" *Fox v. Custis*, 712 F.2d at 88. As that court has stated,

> In one sense, then, *Fox* represented the culmination of a line of analysis that had begun in *Martinez*, for it firmly established that a right of affirmative protection could arise under the fourteenth amendment. But at the same time *Fox*

left the inquiry nearly as open-ended as *Martinez*, for it did not purport to delimit the scope of the right.

*Jensen v. Conrad*, 747 F.2d at 194.

A duty of protection has been found owing by the state and local entities to persons who were not in custody. For example, in *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), the court reversed the dismissal of a complaint alleging that police who had arrested the driver of a car subjected the three passenger children to a "health-endangering situation" by abandoning them. The court reasoned, *inter alia*, that "the police could not avoid knowing that, absent their assistance, the three children would be subjected to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence." *Id.* at 385 (Opinion of Sprecher, J.). In *Thurman v. City of Torrington*, 595 F.Supp. 1521 (D.Conn.1984), the court stated, "City officials and police officers are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community." *Id.* at 1527. This duty was held to require officials having notice of the possibility of attacks on women in domestic relationships "to take reasonable measures to protect the personal safety of such persons in the community." *Id.*

As alleged in the complaint, YCCYS not only had notice that there was evidence of child abuse, but it actually took Aleta in custody, received specific confirmation of child abuse by the physician whom it had examine her, was aware of the source of the abuse, placed her in the protective custody of another relative, informed Aleta's mother that Aleta would be returned to her custody when she made arrangements to have Hake move and to deny him access to Aleta, and returned her without adequately investigating the whereabouts of Aleta, her mother, and Hake. The facts as pleaded allege that the agency was aware that Aleta "as distinguished from the public at large, faced a[ ] special danger." *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559. When the agency knows that a child has

been beaten, "[t]his strengthens the argument that some sort of special relationship had been established." *Jensen v. Conrad,* 747 F.2d at 195 n. 11.

Thus we cannot hold that, as a matter of law, the agency had no duty to Aleta, but we will also, as did the other Courts of Appeals, eschew any comprehensive limning of the parameters of the "special relationship" that suffices to place on an agency an affirmative obligation to persons not in custody. We find it sufficient to hold that in the special circumstances pleaded here, this case falls on the other side of the line suggested in *Martinez.*

### IV.

The district court did not expressly address the issue of proximate cause although it cited the page in the *Martinez* opinion on which the Supreme Court's holding appears. We believe that it is incumbent on us to consider whether Aleta's death was so remote a result of the alleged conduct by the defendants that we must dismiss the complaint on that ground as a matter of law. In *Martinez,* the Court held that the murder by the parolee of a member of the public at large five months after he was released from prison was "too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." 444 U.S. at 285, 100 S.Ct. at 559.

Ordinarily, proximate cause cannot be determined on the basis of pleadings but instead requires a factual development at trial. Thus, for example, in *Black v. Stephens,* 662 F.2d at 190–91, it was left to the jury to determine whether the policy at issue proximately caused the injury. Similarly in *Pembaur v. City of Cincinnati,* 746 F.2d 337, 341–42 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 3475, 87 L.Ed.2d 611 (1985), the Court of Appeals declined to determine whether the injury occurred as a result of the execution of the policy at issue, and remanded for that determination to be made in the trial court. Whether there is an "affirmative link" between "the adoption of any plan or policy

... express or otherwise" and the injury complained of is ordinarily an issue that requires a factual development. *See Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976).

The significant difference between this case and *Martinez* is the fact that the victim in *Martinez* was a member of the public at large while here the agency was aware of a "special danger" to Aleta. Again, we cannot hold that as a matter of law, plaintiffs will be unable to prove the necessary causal nexus between the conduct and the injury.

### V.

We have concluded that this case cannot be dismissed on the basis of the pleadings, unless there are other dispositive legal defenses which the district court did not reach. Although as we have made clear, plaintiffs will have difficult burdens with respect to each of the issues discussed above before they can recover, we are obliged to give them the opportunity to prove their case.

Accordingly, the order of the district court dismissing the complaint will be vacated and the case will be remanded for further proceedings in light of this opinion.

ADAMS, Circuit Judge, dissenting.

Like the majority, I agree that it is incumbent upon us to determine whether the alleged misconduct by the defendants—here the negligent monitoring of the mother's household to which Aleta had been returned—was so removed from Aleta's death that as a matter of law the dismissal of the complaint should be affirmed. Because I differ from the majority's conclusion that the plaintiff's allegations in this case relating to causation distinguish it significantly from *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), I respectfully dissent.

By its express terms § 1983 creates liability for state action that has caused a plaintiff to be subjected to the deprivation of a constitutional right. When, for exam-

ple, liability is urged on the theory of a defective institutional policy, the causation requirement of the statute mandates that the plaintiff demonstrate "a causal link between execution of the policy and the injury suffered." *See Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir. 1984); *Rymer v. Davis,* 754 F.2d 198, 201 (6th Cir.1985); *see also City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985) ("there must be an affirmative link between the policy and the particular constitutional violation alleged"). Inasmuch as § 1983, which was designed to vindicate the fourteenth amendment, reaches only conduct under color of state law, formidable causation issues may be raised when the facts alleged suggest that the state action may have consisted essentially of a failure to prevent the misconduct of a private third party.

The Supreme Court has stated that questions of causation under § 1983 do not turn on the determination whether, as a matter of state tort law, the defendant had a duty to the plaintiff, or could be said to have proximately caused the injury. *Martinez,* 444 U.S. at 284, 100 S.Ct. at 558. Rather, it would seem more appropriate to resolve these issues with reference to the policies and values pertinent to the federal civil rights act, as opposed to the vagaries of the common law. *See* Eaton, *Causation in Constitutional Torts,* 67 Iowa L.Rev. 443, 475 (1982). Particularly apposite in this regard, I believe, is this Court's statement in *Davidson v. O'Lone,* 752 F.2d 817, 827 (3d Cir.1984), *cert. granted sub nom. Davidson v. Cannon,* —— U.S. ——, 105 S.Ct. 2673, 85 L.Ed.2d 692 (1985) in the context a § 1983 action based on allegations that state prison officials failed to protect an inmate against an assault by another inmate. The Court in *O'Lone* observed that when a person suffers injury

as an incidental and unintended consequence of official action or inaction, the abuse of power by a state official which constitutes "an essential element of a § 1983 action" will often be absent. *See also Rhodes v. Robinson,* 612 F.2d 766, 772 (3d Cir.1979). Moreover, when the complaint suggests that the state action may have constituted simply a failure to prevent the misconduct of a private party, we should be especially mindful of the Supreme Court's admonition that § 1983 does not create a federal cause of action for every wrong committed by government employees, no matter how unpleasant the consequences, and notwithstanding that the facts might give rise to a state tort law claim. *E.g., Martinez,* 444 U.S. at 285, 100 S.Ct. at 559; *see Paul v. Davis,* 424 U.S. 693, 699, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976).

The present case arises from the district court's dismissal of the complaint for failure to state a claim upon which relief could be granted. A line of cases in this Court has held plaintiffs in civil rights cases to a heightened standard of specificity in pleading. *E.g., Rhodes,* 612 F.2d 766; *Rotolo v. Borough of Charleroi,* 532 F.2d 920, 922 (3d Cir.1976). One basis of this requirement is to weed out frivolous or insubstantial cases; a second rationale is to separate those cases involving injuries implicating state actors but that properly "should be litigated in the State courts." *See Rotolo,* 532 F.2d at 922; *Kauffman v. Moss,* 420 F.2d 1270, 1276 n. 15 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). The question for the Court today is thus whether the complaint here alleges a sufficient basis upon which a jury could find that the state action or inaction, as opposed to the conduct of private third parties, has caused the plaintiff to be subjected to the deprivation of a constitutional right.[1]

---

**1.** To remand a legally insufficient claim for trial wastes the time and resources of the litigants as well as those of the courts, in addition to creating the risk of an erroneous result.

Neither *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct.

1646, 71 L.Ed.2d 876 (1982), nor the recent decision of *Pembaur v. City of Cincinnati,* 746 F.2d 337 (6th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 3475, 87 L.Ed.2d 611 (1985), cited by the majority, stand for the proposition that it is generally imprudent for courts

In *Martinez*, which involved a § 1983 suit against members of a state parole board that had released a person who eventually assaulted and killed the victim, the Supreme Court held that, although the plaintiff may have alleged sufficient facts to demonstrate that the parole board could be said to have a duty to the decedent or to have proximately caused the injury as a matter of state law, the *state action* nevertheless had not deprived the victim of her constitutional rights. The Supreme Court stressed in its discussion of causation that the alleged deprivation occurred some five months after the challenged state conduct, and that the victim's life was taken by a person, the parolee, who "was in no sense an agent of" the defendant. 444 U.S. at 285, 100 S.Ct. at 559.

An application of these same factors to the present case would suggest that the tragic death of Aleta Bailey was too remote a consequence of the agency's actions to hold the defendants responsible under the civil rights statute. A substantial period, five weeks, elapsed between the agency's control of Aleta and her subsequent death. More importantly, Aleta was killed by two persons who were in no sense agents of the state. *Cf. Doe v. New York City Department of Social Services*, 649 F.2d 134 (2d Cir.1981) (abuse of child in custody by a foster parent who had been certified by the state).[2]

Although as the majority notes the child welfare agency may have been aware that Aleta faced dangers not shared by all children in Pennsylvania, *cf. Martinez*, 444 U.S. at 285, 100 S.Ct. at 559 (awareness of "special dangers"), I do not believe that the steps allegedly taken by the state employees created the sort of special relationship that might support the finding of a sufficient causal link with the criminal acts of private persons five weeks after the state agency had returned Aleta to her natural mother.

Finally, it bears emphasis that § 1983 was enacted to deal primarily with acts of discrimination by state officials. There is a danger that by extending this important legislation to contexts far removed from Congress' original and overarching purposes, a national state tort claims act administered in the federal courts in effect will be created. Steps in that direction should not be lightly taken since the ultimate outcome of such a course might well be incongruent with our role as federal judges. When a court extends a statute far beyond what was contemplated by Congress, it transgresses the concept of separation of powers.

For the foregoing reasons, and primarily because I believe *Martinez* to be controlling, I respectfully dissent.

of appeals to determine at an early procedural stage whether as a matter of law an alleged injury might have been caused by state action instead of remanding that issue for a determination after factual development at trial. Procedurally, both the cited cases reached the appellate court after trial. Moreover, in *Pembaur* the Sixth Circuit remanded to the trial court the issue of causation because the district court had erroneously identified the city policy at issue in the case and consequently never made a proper causation determination. 746 F.2d at 342.

**2.** The Supreme Court's recent decision in *Brandon v. Holt,* —— U.S. ——, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), offers plaintiffs little assistance in this regard. That case stands for the proposition that a judgment against a public servant in his official capacity imposes liability on the entity he represents. There was no claim in *Brandon* that the complaint

had not alleged a sufficient causal nexus between the actions of all the defendants and the plaintiffs' injuries. In *Brandon,* defendant Allen was the police officer who actually assaulted the plaintiffs. His supervisor, defendant Chapman, was the director of the police department, sued in his official capacity. Deficient procedures employed by Chapman essentially covered up officer misconduct and totally insulated supervisors from knowledge of wrongdoing by officers. 105 S.Ct. at 876 n. 6. Because of these faulty procedures, the supervisors of the police department ignored or were unaware of Allen's history of violent and irregular behavior, including several complaints of abuse of authority and use of unnecessary force. This failure to take steps to prevent repeated abuse of official authority by subordinates is far different from the allegations in the present case of a failure to protect a child from the criminal acts of independent third persons.

**514**

Before ALDISERT, Chief Judge, and SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.

## SUR PETITION FOR REHEARING

The petition for rehearing filed by *Appellees:* COUNTY OF YORK, YORK COUNTY CHILDREN AND YOUTH SERVICES in the above entitled case having been submitted to the judges who participated in the decision of this court and to all other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Circuit Judge ADAMS votes for rehearing in banc for the reasons set forth in his dissenting opinion, and because he believes that expanding the scope of § 1983 beyond the confines of the statute imprudently burdens the federal courts and encroaches on jurisdiction reserved for the state court system.

Circuit Judges JAMES HUNTER, III and GARTH would grant the petition for rehearing in banc.